## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| ROBERT CARBONE,<br>21 KENNETH CIRCLE<br>GUILFORD, CT 06437<br><br>      Plaintiff,<br><br>          v.<br><br>WULF KAAL;<br>212 W. WASHINGTON ST.<br>CHICAGO, IL 60606<br><br>MICHAEL STEUER;<br>9032 GIBSON ST.<br>LOS ANGELES, CA 90034<br><br>RAPHAEL BAUMANN;<br>BAARERSTRASSE 10<br>6300 ZUG, SWITZERLAND<br><br>THE OPEN SOURCE STANDARDS<br>ASSOCIATION;<br>BAARERSTRASSE 10<br>6300 ZUG, SWITZERLAND<br><br>THE EMERGING TECHNOLOGY;<br>ASSOCIATION;<br>BAARERSTRASSE 10<br>6300 ZUG, SWITZERLAND<br><br>and "JOHN" and "JANE" DOE DEFENDANTS<br>##1-35, whose names and addresses could not be<br>ascertained at this time,<br><br>      Defendants. | CASE NO.:<br><br><br>JUDGE:<br><br><br>**[JURY DEMAND ENDORSED<br>HEREON]** |

## COMPLAINT

Plaintiff Robert Carbone ("Plaintiff" or "Carbone"), in support of his Complaint against the Defendants, Wulf Kaal ("Kaal"), Raphael Baumann ("Baumann"), Michael Steuer ("Steuer"), the Emerging Technology Association ("ETA"), the Open Source Standards Association ("OSSA"), and unidentified "John" and "Jane" Doe Defendants (collectively, "Defendants"), states the following:

## NATURE OF THE ACTION

1.      Kaal, Baumann, and Steuer (collectively the "Individual Defendants") published allegations that Carbone engaged in serious sexual misconduct against the Compliance Director of the ETA, Hayley Howe. The allegations, however, were entirely unsubstantiated as evidenced by a communication from Baumann that acknowledged that Ms. Howe did not want to pursue any claims or act as a witness. Carbone suspects that the Individual Defendants used Ms. Howe and does not believe at present that Ms. Howe had the intent to harm Carbone. By Baumann's own admission, no evidence existed against Carbone. The Individual Defendants, thus, knew that Carbone never engaged in serious misconduct yet published unsupported and false allegations to: (a) members (also referred to as voting associates, or "VAs") of the association assembly of the ETA (called the Developers Decentralized Autonomous Organization ("DEVxDAO")); and (b) members of the association assembly of OSSA (called the Code Review Decentralized Autonomous Organization ("CRDAO")). The ETA/DEVxDAO and the OSSA/CRDAO[1]  are

---

[1] As will be explained in the Complaint, the DEVxDAO has multiple members who vote on actions that the DEVxDAO will undertake. Once voted on, the DEVxDAO must forward the voting consensus to the board of the ETA. A specific position was created to represent the consensus of the DEVxDAO members on the board of the ETA; this individual is known as the delegate association member ("DAM"). Notably, the DAM holds more voting power than the other members of the board combined. Consequently, the actions of the ETA and the DEVxDAO are extensions of one another. The same mechanism applies to the OSSA and CRDAO. Thus, this is why the terms are jointly referred to in certain contexts throughout the Complaint.

2

collectively referred to herein as "The DAOs." As a result of the Individual Defendants publishing the aforementioned allegations as described herein Carbone was unjustly removed[2] from The DAOs.

2.      For background, the ETA and OSSA are two decentralized autonomous organizations allegedly operating under Swiss law governing associations ("Swiss Vereins"). Upon information and belief, very few jurisdictions in the world (if any) recognize DAOs as separate legal entities. Given developments in the "crypto space," investor interest in DAOs has increased because they supposedly lack central control (unlike traditional corporate structures); facilitate certain novel transactions; and purport to have the ability to achieve fair, equal, and unbiased decision-making through consensus. Nevertheless, as much as DAOs are touted as being corporate-like in organization, they are not legally recognized entities in the traditional sense, or in the business sense.

3.      In general, a DAO has no legally recognized corporate structure; no explicit liability protection; and no distinction between managers and directors, or between general and limited partners. Instead, holders of specific tokens created to support the ecosystem of the DAO have governance rights that allow holders to propose and approve actions that the DAO will take. Actions include many of those typically done by corporate officers, boards, or employees, such as spending funds to hire people; changing organizational goals and policies; and even distributing assets to the token holders (like how corporations can authorize dividends or other distributions of profits). Holders of governance tokens thus may participate in the governance of a protocol, have a potential claim on its profits, and share responsibility for its liabilities.

---

[2] Carbone disputes that he was properly terminated from The DAOs.

4.      Given the unknown way DAOs are to be legally treated, including how such treatment may affect this lawsuit, Plaintiff includes "John" and "Jane" Doe defendants ##1-35, who may be, *inter alia*, individual members of The DAOs and presently unknown or unidentifiable. Plaintiff, thus, reserves the right to substitute any such members as Defendants to this lawsuit in placed of one or more of the "John" or "Jane" Doe defendants depending on how the legal and factual contentions in this case develop.

5.      Carbone contends that he was improperly terminated from the DAOs as a result of the defamatory statements promulgated by the Individual Defendants. The actions of the Individual Defendants were malicious and intended to cause Carbone serious reputational and emotional harm. In addition, Carbone also lost reputation points created under The DAOs' structures that had significant monetary value, as well as grants related to The DAOs that were also of considerable monetary value. Importantly, the Individual Defendants knew that their publication of the false claims against Carbone would result in his ouster and, consequently, loss of his reputation points and grants, which resulted in economic harm. The Individual Defendants, therefore, are also liable for the tortious interference of the contractual/business relations that Carbone developed while working for The DAOs.

## THE PARTIES

6.      Plaintiff Robert Carbone is an individual and resident of the State of Connecticut.

7.      Upon information and belief, Wulf Kaal is an individual and resident of the State of Illinois. Kaal was a co-founder of the ETA/DEVxDAO and held the title of "executive member." With respect to the OSSA/CRDAO, he was also a co-founder and a board member.

8. Upon information and belief, Raphael Baumann is an individual and resident of Switzerland. Bauman was a board member of the ETA/DEVxDAO and was responsible for investigating the incident concerning Carbone.

9. Upon information and belief, Michael Steuer is an individual and resident of Los Angeles, California. Steuer was the only delegate association member (referred to as "DAM") of the ETA/DEVxDAO and OSSA/CRDAO, which was a position created within both associations that held a majority of voting rights for both DAOs, and was influential in Carbone's ouster from The DAOs. In other words, Steuer represented the majority votes of the members of The DAOs and presented the members' consensus to the boards of The DAOS. Steuer, therefore, voluntarily acknowledged that he would carry out the voting consensus for the members of The DAOs as the DAM and, consequently, assumed the risk of his role.

10. The ETA is a Swiss association (Verein) purporting to have been validly constituted in accordance with Swiss law and operating as a not-for-profit entity. The ETA's governance and administration are run through the website domains emergingte.ch. and/or devxdao.com.

11. The OSSA is a Swiss association (Verein) purporting to have been validly constituted in accordance with Swiss law and operating as a for-profit entity. OSSA had three bodies: (1) the Association Assembly (i.e., the CRDAO); (2) a board; and (3) an auditor. OSSA's governance and administration are run through the website crdao.ossa.dev.

12. Upon information and belief, the ETA and the OSSA are not formally organized as a corporation, LLC, partnership, or other recognized organization type which would serve to limit the liability of its members.€

13.     The "John" and "Jane" Doe defendants ##'s 1-35 are presently unknown or unidentifiable individuals and include individuals who may, *inter alia*, be members of The DAOs and subject to the rulings from this Court.

## JURISDICTION AND VENUE

14.     Pursuant to 28 U.S.C. § 1332(a)(2), "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . (2) citizens of a State and citizens or subjects of a foreign state." Diversity jurisdiction, thus, exists in this matter because (1) the parties are citizens of different states (or foreign states); and (2) the amount and controversy exceed $75,000.00.

15.     In this case, Plaintiff and Defendants are citizens or subjects of a foreign state and the amount in controversy exceeds $75,000.00, which is based on the total damages stemming, for example, from the reputational and emotional damages; loss of value from reputation points that were divested (as explained below); and loss of grants (also explained below).

16.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this district because, upon information and belief, "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated," in Columbus, Ohio.

17.     This Court has personal jurisdiction over the Defendants because Defendants transacted business in Ohio, engaged in business acts in Ohio and/or caused a tortious injury through events occurring in Ohio.

18.     In this case, Defendants voluntarily transacted business in Ohio and it appears that both the digital location of the internet protocol ("IP") address and the physical location of the

server from which the defamatory statements were published and distributed (and the ensuing tortious acts were committed) was in Columbus, Ohio.

19.     Specifically, members of the ETA/DEVxDAO, including the Individual Defendants, used the website domain devxdao.com (the "Website") to engage in business dealings related to the DEVxDAO. The Website serves as a portal by which the general public, Program Applicants, and Program Associates interact with the Program.

20.     The members consented to the creation and use of the Website for the ETA/DEVxDAO's business dealings, and also to the retention, securing and use of all related facilities, equipment, and technology, wherever located, for that purpose.

21.     The Website transmits information through a server/IP address that is located in Columbus, Ohio.

22.     Thus, by designating devxdao.com as the Website from which member actions would be discussed, evaluated, voted on, and approved or denied, all members of the ETA, including the Defendants, voluntarily accepted such designation, as well as the use of the Columbus, Ohio server/IP address for communications and other activities carried throughout the Website. Those members, including the Defendants, have therefore availed themselves of the jurisdiction in which the server operating the website was located, which is the State of Ohio.

## FACTS

I.      **The DAOs Structure and How Defendants' Actions Led to Carbone's Damages.**

      A.      **Creation and Purpose of the ETA/DEVxDAO and OSSA/CRDAO.[3]**

            a.      **Kaal's White Paper on DAOs in general and the ETA/DEVxDAO.**

23.      Kaal wrote the white paper[4] concerning the ETA and the DEVxDAO.[5]

24.      The stated purpose of the DEVxDAO, as indicated in its white paper, is to create a technological infrastructure design that allows it to create, improve, and expand "well-functioning and well-governed networks of DAOs," which in turn are supposed to improve "most of the applications and uses of digital assets for the greater good of society."

25.      The DEVxDAO reflects the belief that a DAO will help upgrade digital assets across the spectrum of applications and uses, which may extend to "financial transactions, secure voting, autonomous organizations, company management, freedom of speech networks, online games, crowdfunding, and speculation, among many other possible applications that cannot be foreseen." Further, Kaal argued that "[t]he concept of a DAO fails if it becomes centralized."

26.      As expressly recognized by Kaal in the DEVxDAO white papers, "[t]ying the legal existence of a DAO to any forms of existing legal and jurisdictional frameworks typically results in the need for a representative in the chosen legal framework and jurisdiction, which, in turn,

---

[3] The paragraphs concerning the ETA/DEVxDAO white papers are provided to contextualize Kaal's bad faith motive to oust Carbone from The DAOs. Likewise, these statements help explain the basis for Carbone's monetary damages. While the structure of DAOs is difficult to explain in general, they become even more difficult to explain in this case given the type of structure that was actually followed by The DAOs. The inclusion of these sections is, thus, meant to help the Court understand these novel concepts and how they tie to the claims pled in this Complaint.

[4] A white paper is generally understood to be an informational document issued by a person, company, or other types of organizations, with the intent to propose the features of a solution, product, or service that it offers or plans to offer.

[5] Subsequently, Kaal co-authored a book titled *Decentralization: Technology's Impact on Organizational and Societal Structure* that adopted the same precepts reflected in his white paper.

centralizes the DAO and results in the failure of the DAO concept." In other words, the creation

of the DAO is intended to purposefully avoid traditional corporate structures such as limited

liability corporations, s-corporations, or (as is relevant in this case) partnerships.

27.     Kaal acknowledged the weak legal footing that underpinned DAOs: "[f]rom the

perspective of regulatory competition, one jurisdiction may one day offer a DAO legal framework

that removes the need for a representative in that jurisdiction. **However, even if this should exist**

**one day, a significant risk remains that such a DAO entity could be labeled a partnership**

**with joint and several liability for its members in a given jurisdiction**."

28.     In addition, Kaal indicated that:

> If the DAO is not properly legally formed, DAO participants can be held personally
> liable for the DAO's liabilities. Historically, DAOs did not incorporate or officially
> create a corresponding legal entity off-chain for their on-chain existence. The lack
> of legal recognition of DAOs creates uncertainty as to how they would be treated
> by a court should they be sued. That is, the average DAO participants might not
> expect to be held liable for liabilities or obligations of the DAO. **However, a very**
> **serious risk is associated with DAO membership in the sense that if the DAO**
> **members do not formalize a structure for their human-created entity, courts**
> **are very likely to impose one for the members of the DAO**. **It is possible for a**
> **DAO to be legally construed as a general partnership or joint venture. Under**
> **U.S. law, DAOs are most likely to be treated as partnerships.** [6]

29.     Kaal acknowledged that "[a]s partners, DAO participants are potentially liable

jointly and severally for all debts, obligations, and other liabilities of the partnership. That could

mean that any known participants in the DAO may be targets for regulatory enforcement or civil

actions."[7]

---

[6] Arguably, The DAOs *are* simple partnerships pursuant to Swiss law given how they were created and
managed.

[7] Plaintiff names the unknown and unidentified "John" and "Jane" Doe defendants as parties to this lawsuit
given the potential that the former and/or current members of The DAOs may be, potentially, liable for the
relief requested in this Complaint.

30.     In further recognition of the legal risks of operating a DAO, Kaal noted that "[a]nother legal risk associated with DAOs pertains to the legal recourse for third parties who contract with a DAO," wherein it is "less clear who a liable party may be in a DAO." Kaal adds that "[w]ithout clearly defined liability rules, third parties and investors in DAOs may have less clearly defined legal recourse" and that "[p]arties may be able to limit remedies to DAO assets through private agreements. **But, if the DAO should face a tort suit, such an agreement is unlikely to be upheld**."

31.     One of the stated features of the DEVxDAO would be to recognize "human nature" and prevent the gaming of governance design by providing: (a) incentives for actors to improve their own utility, while at the same time also providing incentives for (b) the actors' actions to benefit the entirety of the institution and its constituents for the long run.

32.     Ironically (as will be explained below), Kaal indicated in the white paper that "[w]hen fungible assets are used as the dominant incentive design in the governance of DAOs with identifiable actors, **rational and opportunistic internal constituents and external participants will typically attempt to corrupt the governance design of the DAO for their own gain**. Similarly, the identity of actors in a DAO governance design creates typically corruptive elements. Merit identifiers other than individual identity remove the most corruptive influences."

33.     According to Kaal, the "supervision of management and imposition of legal duties on management is less needed [compared to other corporate structures] because there are fewer or no supervisors" and, instead, "token holders optimize the DAO together according to their best value propositions in accordance with their unique skillsets, backgrounds, and training."

34.     In sum, Kaal summarizes DAO governance structures as:

built on software, code and smart contracts that run on public decentralized blockchain platforms. DAOs typically do not have a physical address as they

merely compute code. Because of these code-based features, DAOs are not organizations with a traditional hierarchy as known from traditional corporate structures where authority and empowerment flow downwards from investors/shareholders through a board of directors to management and eventually staff. Indeed, DAOs typically do not have directors, managers, or employees. Because a series of smart contracts grants DAO token holders voting rights, the blockchain-based smart contracts imitate the role of articles of association or bylaws and the entirety of a precedent system that would otherwise be provided by default in a jurisdiction-based legal structure. Because DAO code is typically open source, the token holders not only vote on investment and/or work proposals, but also on any change made to the code. Accepted proposals would also be backed by a software code, defining the relationship (in terms of rights, obligations, and performance metrics) between the respective DAO and the accepted and funded work proposals.

### b. The DEVxDAO's purpose and function

35. The DEVxDAO was created with the idea that an internal and external governance design would be "built-in" to its structure and operations to help "optimize the decentralized nature of the DEVxDAO."

36. For internal governance, the DEVxDAO uses a system of reputation token staking that facilitates "unprecedented incentivization of the DEVxDAO community and governance improvements in orders of magnitude."

37. For external legal relationships and governance, the DEVxDAO is represented in real-world legal contexts by the ETA.

### c. The ETA's purpose and function

38. The stated objective of the ETA is to establish a decentralized and democratic association with flat hierarchies. The ETA intends to accomplish this objective by supporting open source and transparent research and development of emerging technologies and frameworks for community building and governance by way of receiving grants from unaffiliated entities and issuing grants to a broad array of experts, developers, and scientists around the globe. **Put simply,**

**one way that the ETA generates money for itself, and its members, is by the issuance of grants**.

39.     Below is a pictograph of how Kaal viewed the legal structure of the ETA under Swiss law and how it purports to protect and shield the DEVxDAO and other DAOs:



40.     The DEVxDAO was intended to be the first and primary DAO in the ETA infrastructure.

41.     Because the internal governance of the DEVxDAO was intended to be decentralized and effective through reputation staking, it was supposed to create "internal governance solutions that translate well into real-world legal solutions that are instantiated via the ETA and vice versa." Stated differently, the idea appears to have been that the members of the DEVxDAO would vote on a proposal (i.e., decentralized actions) based on their internal reputation staking mechanism, and the ETA, in turn, was legally designed to externally carry out such decentralized decisions into the "real world."

42.     Within the ETA/DEVxDAO, what really transpired was that Kaal created sub-structures that purported to operate at the behest of the ETA/DEVxDAO's members but were puppeteered by Kaal (e.g., the Policy DAO).

43.     In addition, the ETA was also purportedly entrusted with enforcing a code of conduct on the ETA/DEVxDAO members.

44.     A draft version of the Code of Conduct that supposedly governed the DEVxDAO was published on the ETA website.

45.     There is no information that confirms whether the draft was formally approved and adopted to extend to the members of the DEVxDAO. Likewise, there is no information that the Code of Conduct was published to members of the DEVxDAO.

**B.      Voting Structure of the DEVxDAO**

46.     The voting structure of the DEVxDAO followed the belief that decentralized voting was the best course because DAO members "typically know best how to assess other users / DAO members." Thus, the idea was that the decentralized voting structure "enables unprecedented information symmetry in the governance design" because, in theory, the DAO group collectively decides "group decision-making metrics and DAO governance protocol needs" that is supposed to yield "a continuous and iterative stream of information that provides dynamic feedback effects."

47.     One of the stated "key for success" of the ETA/DEVxDAO was the "unique duality of internal and external governance of the DEVxDAO" given how the ETA was to afford "broad deference . . . to the voting outcomes that originate in the DEVxDAO," which would purportedly be accomplished by the delegation of voting power and outcomes from the DEVxDAO to a member of the ETA, called the Delegate Association Member ("DAM").

48.     The white papers indicated that, under the ETA Articles of Association, the ETA's board would not act as a board of directors in the traditional sense but, instead, "merely executes the decisions of the DEVxDAO," unless an action required a physical person to undertake it on behalf of the ETA.

49.     Under the ETA Articles of Association, the individual designated as the DAM merely executes the upvotes on a given issue coming out of the DEVxDAO and "the majority of the voting rights can also convene an extraordinary Association Assembly at any time." In other words, the individual acting as the DAM is supposed to vote consistently with whatever the general members of the ETA/DEVxDAO vote for.

50.     Through the votes executed in the DEVxDAO and represented in the ETA assembly, the DEVxDAO determines the funding allocation for projects the DEVxDAO sponsors.

51.     In the ETA assembly, the DAM always has more votes than the other members of the ETA board.

52.     In theory, all DAOs constituted under the ETA exercise their voting power through the ETA's DAM under the ETA Articles.

53.     The DEVxDAO was supposed to establish minimum viable protocol requirements ("MVPR") that apply to any and all DAOs that operate under the ETA's legal framework.

54.     The MVPR established a system of reputation staking for the internal governance of the DEVxDAO. After adopting the MVPR (adopting entirely or hard forking the MVPR code), each DAO in the ETA structure votes independently through a DAM in the ETA who represents the total upvotes from each DAO in the ETA general assembly.

55.     While the ETA was considered a form of centralization of the DEVxDAO, the DEVxDAO had the potential to remove the ETA structure incrementally. The DEVxDAO could,

14

for instance, replace the DAM in the ETA, a core point of centralization, with a smart contract. The automation of the DAM was a key objective of the DEVxDAO to continually enhance its decentralization.

### C. Reputation points in Theory

56.     The DAOs were created with a reputation-based staking system in mind, which would act as a voting mechanism for its members.

57.     It appears that reputation points are similar to equity in a traditional corporate framework.

58.     According to the white paper, reputation-based voting revolves around voting by way of staking a non-fungible asset, aka staking non-fungible reputation tokens ("NFTs") in a given DAO, towards a certain outcome. The basis for using NFTs was premised on the supposed reduced likelihood that third parties would acquire these NFTs and maintain a reputation score and the associated revenue stream over time. Put simply, the reputation-staking was meant to benefit people who actively participated in the DAO – *not* people who simply held the NFT.

59.     In the DEVxDAO's bifurcated design, two types of tokens would be used: reputation tokens and reputation salary tokens.

60.     The non-fungible reputation tokens give DEVxDAO members voting rights.

61.     The fungible reputation salary tokens, in turn, would allow DEVxDAO members to earn a fungible salary in proportion to their non-fungible reputation tokens.

62.     The idea behind this token system was to allow the DEVxDAO members to increase their non-fungible tokens by making valuable contributions to the DAO and participating consistently in DEVxDAO voting pools. DEVxDAO members would then be paid based on a

"fungible algorithmic stable token that is pegged to a pool of fungible tokens/good/consumer price index."

63.     The salary payments in fungible stable tokens are in proportion to DEVxDAO members' respective non-fungible reputation token scores.

64.     According to the white papers, the indirect economic effects supposedly remove corruptive elements and make the governance design more attack-resistant and stable in the long run.

65.     Because "reputation" would be used as a metric for indirect economic benefits (i.e., a salary in fungible tokens that is paid in proportion to the non-fungible reputation token score), DEVxDAO reputation token holders were intended to be incentivized to increase their own reputation/utility by engaging in valuable conduct for the DAO. The more the aggregated individual reputation of all DEVxDAO members increases, the more the overall DEVxDAO value increases, and the more the DEVxDAO creates value-enhancing outcomes for its members.

66.     Alternatively, if the DEVxDAO member *does not* engage in "valuable conduct," then their reputation loses its value over time.

67.     In theory, the DEVxDAO member reputation is transparent and reviewable by the DEVxDAO and the public in a slow, stable, yet dynamic review process that reaches far into the future.

68.     The reputation-based DEVxDAO governance design is intended to create a positive-sum game because DEVxDAO members have incentives to create lasting non-fungible value for the DEVxDAO by developing a long-term non-fungible record of productive cooperation that in effect improves the DEVxDAO. Moreover, individual DEVxDAO member reputation can change dynamically if the DEVxDAO member's actions depreciate in value.

69. The DEVxDAO member reputation is inflationary in the DEVxDAO design. As such, non-use (i.e., non-staking of reputation tokens or non-voting) would lead to value depreciation, which incentivizes action and thus value enhancement.

70. Thus, to ensure continuous cooperation of DEVxDAO members, the promise of future profits in the DEVxDAO reputation token outweighs their present value.

71. The DEVxDAO reputation token has a more stable and predictable value as the ETA onboards additional grants and the DEVxDAO network grows globally.

72. Reputation tokens in the DEVxDAO system are correlated with expected future salary token disbursement in the ETA.

73. In the DEVxDAO design the loss of opportunity from slashing DEVxDAO member reputation grows as the size of the network increases. In other words, the larger the DEVxDAO network, the more competition for reputation tokens to receive fungible token salaries.

74. Further, given the incomplete information due to increasing anonymity, the value of the information from reputation tokens increases.

75. The DEVxDAO reputation-staking was designed to purportedly enhance policing and compliance. The value of DEVxDAO member reputation is directly related to how well "punishment" can be distributed in response to cheating.

76. The white papers noted that DEVxDAO members can join from any jurisdiction and cannot be tracked or punished for any bad behavior by appealing to outside authorities. In that case, the only punishment available is to take away DEVxDAO members' potential future reputation token salaries in the DEVxDAO.

77. The DEVxDAO's periodic reputation-weighted salary that distributes all fees the DEVxDAO earns through the ETA to all members.

17

78. Individuals who bring successful ideas to the DEVxDAO or perform tasks that bring fees to the ETA will be rewarded with reputation tokens, not salary tokens.

79. DEVxDAO members who own more reputation tokens share a larger percentage of the salary pool.

**D.      Reputation points in Practice**

80. In practice, not all of the precepts reflected in the white papers concerning the creation, distribution, and valuation of reputation tokens were carried out. For example, upon information and belief, the two-token system reflected in the white paper was not implemented.

81. First, the idea to create reputation *tokens* – which means that they are tied to a blockchain – did not actually happen. As such, the members of the ETA/DEVxDAO agreed that they would keep track of their reputation *points* "manually" (so to speak).

82. New members would obtain reputation points by default. The origin of these reputation points (i.e., how they came into existence in the first place) is unknown.

83. Once the reputation points were obtained by the new member, the new member could either not use the reputation points (the value of which would depreciate over time if not used) or could use the reputation points to maintain or increase their value.

84. Kaal and other members were given a higher amount of reputation points than other members.

85. The DEVxDAO members decided how to distribute the reputation points.

86. During the course of the DEVxDAO, grants would be proposed by its members.

87. DEVxDAO members had to vote on 70% of the grant proposals put forth by other members to show that they were active within the ecosystem; if they did not vote on 70% of the proposals, then they would not receive monthly compensation tied to their reputation points. In

other words, having reputation points – by itself – would not entitle the member to receive compensation if they were inactive.

88.     Each grant proposal put forth by a DEVxDAO member would need be to "staked" by other members. So, if a member had 500 reputation points, they could vote for or against a grant by allocating a certain amount of reputation points (for example, 100 reputation points out of the 500 available points). Crucially, the proposal was approved – not by the number of members for the proposal – but, instead, by the amount of reputation points staked in total. So, for example, if ten members staked 1 reputation point each in favor, but one member staked 100 reputation points against, the sole member staking the 100 reputation points would dictate the rejection of the grant.

89.     If the proposed grant was approved by the members, a mathematical formula was in place where the total amount of reputation points originally staked would increase in value based on the mathematical formula. In other words, new reputation points beyond the reputation points originally staked would be generated given the grant approval (i.e., the mathematical formula would create new reputation points that would be proportionally allocated to the members who voted on the successful proposal).

90.     The accumulated reputation points of the ETA/DEVxDAO members granted the members the right to receive a monthly income that was valued in "CSPR," which is a cryptocurrency of the Casper Blockchain. As such, a monetary value in either dollars or euros could be attributed to the reputation points via the Casper cryptocurrency tied to the reputation points.

91.     Given the penalty imposed on proposed grants that failed (i.e., did not obtain a certain threshold of reputation points to its favor), what ensued during the DEVxDAO was "informal" discussion on grant proposals before a grant was placed for formal voting; this,

actually, increased the probability that reputation points would remain intact or increase. **Moreover, the use and custom that developed and was accepted created a culture of fear that if one did not vote with the consensus, one would lose their reputation points (i.e., this allowed certain individuals to dictate the narrative and, consequently, *centralize* the decision-making process)**.

92.     Furthermore, although the whitepapers indicated that anonymity was a central tenant of the voting structure of the ETA/DEVxDAO, in reality, there was **no** true anonymity.

93.     The reputation points obtained by the ETA/DEVxDAO members were valued in the CSPR token, which means that the reputation points could be considered to have real monetary value in either dollar or euro currency terms. Nevertheless, the value varied greatly given the volatility of the CSPR token.

**E.     Grant system and monetization of such system**

94.     As reflected above, the The DEVxDAO provides grants to developers and scientists in Switzerland and around the world.

95.     The DEVxDAO through its legal arm/legal instantiation, the ETA, supports open source and transparent research and development of emerging technologies and frameworks for community building and governance by way of issuing grants to a broad array of experts, developers, and scientists around the globe.

96.     The distribution of incentives is an internal function as well as an external function of the DEVxDAO.

97.     In sum, the idea was that a grant-based system that could be financed by third parties would be introduced into the ETA's ecosystem, wherein research grants could be accepted

by members, worked on, and the members would receive an amount of cryptocurrency that itself was tied to either a dollar-denominated or euro-denominated value.

**F.      Relationship between The DAOs and Casper**

98.      CasperLabs was touted as a leading 3rd generation blockchain, providing weighted keys as an accounting metric as part of its key design specifications, which supposedly provides an ideal environment for reputation management and accounting.

99.      The Casper Association ("Casper") and the ETA entered into a Program Agreement wherein Casper would, in sum and substance, fund certain grants with the DEVxDAO to develop its own blockchain and cryptocurrency alongside the ETA infrastructure.

100.      The program between Casper and the ETA/DEVxDAO required the ETA to report program developments and targets.

101.      What ended up happening, however, was that Casper became the predominant funder of grants to the ETA/DEVxDAO. As a result of this influence, the purported decentralized ambition of the ETA began to collapse.

**G.      Alleged Dissolution of the DEVxDAO**

102.      On July 6, 2023, a proposal to dissolve the DEVxDAO was submitted by Kaal for member approval ("Dissolution Proposal"), which means that he took the initiative to develop the simple proposal.

103.      According to Dissolution Proposal, a document titled Management's Discussion and Analysis and Risk Factors was attached to the proposal.

104.      The Dissolution Proposal was designed to: (a) "terminate and dissolve the DEVxDAO with immediate effect"; (b) "[a]dopt the attached Settlement Agreement with Casper Association"; and (c) dissolve the DEVxDAO and ETA Grant Program.

105.    In order to complete the dissolution, a number of elements were proposed, including a "maintenance grant for all current VAs." In addition, a "future protection" was included, wherein each VA would have "14 days to sign the termination agreement from the date it is sent to them via DocuSign" and failure to do so "shall be deemed to have rejected ETA's offer, waiving all benefits in the termination agreement including maintenance grant and protections."

106.    Furthermore, the Dissolution Proposal stated that – after the DEVxDAO is dissolved – the ETA "will change from an active grant giving organization to a dormant organization responsible for managing a few remaining non-assigned grants" and purports to act "as a legal shield for former VA and former and current ETA Parties for the next ten (10) years."

107.    Given the interrelation between the ETA and The DAOs, including the arguable self-dealing that occurred among members, it is very questionable whether the ETA can serve as a legal shield for members of the ETA and The DAOs. This concern is further augmented by the fact that the ETA will supposedly establish and maintain for ten years a legal defense fund in the amount of the remaining Casper tokens held by the ETA (estimated at 100 to 200 million according to the Dissolution Proposal) for several purposes and to "protect" certain beneficiaries.

108.    One of the purposes is to use the funds to the benefit of "Beneficiaries" who "becomes a party to or be a witness or is threatened to be made a party to or a witness or to participate in, any claim by reason of (or arising in part out of) the DxD program or the operations of the ETA up to July 10, 2023." The fund purports to pay "any and all attorney costs as well as final judgments awards."

109.    The Beneficiaries are defined as the ETA "and its current and former officers and directors; Current Voting Associates of the DEVxDAO and CRDAO who fully executed the termination agreement." Relatedly, the Dissolution proposal admits "new association members,"

which include Charles Wismer, Wulf Kaal, Michael Steuer, David Tai, Tim Messer, Alex Kelly, Austin Davis, and Muhammat Kara.

110. The Dissolution Proposal is highly questionable given that – if it's true that the ETA was acting independently – it must investigate the actions of Kaal and other members who used The DAOs for self-dealing and breached their fiduciary duties, as mentioned below.

**H. The OSSA/CRDAO**

111. Kaal also authored a white paper for the OSSA/CRDAO.

112. The stated purpose of the CRDAO is to provide a decentralized community-driven code review process that utilizes a bidding process on code reviews to drive prices down. It intends to provide open access for code reviews from anyone who qualifies – not just members of the code review cartel. In addition, it purports to offer its members a decentralized governance framework.

113. The OSSA/CRDAO was run relatively similarly to the ETA/DEVxDAO, with some differences that are not relevant to this suit.

**II. THE RELATIONSHIP BETWEEN THE PARTIES**

**A. Mr. Carbone's involvement with The DAOs.**

**a. Vesting of Reputation Points**

114. Mr. Carbone is a distributed systems engineer/programmer and accountant who has a passion for empowering groups of people to program decentralized systems together. Mr. Carbone's interest is in building message-passing and data management systems that ultimately serve to facilitate professional goals. When Mr. Carbone first learned about the DEVxDAO, on or around March 2021, he became interested in joining a community of like-minded individuals in pursuing communal goals.

23

115.    When Mr. Carbone first joined The DAOs, he was allocated a set of reputation points based on work performed for The DAOs

### i.    ETA/DEVxDAO

116.    Carbone began working at the ETA/DEVxDAO as a regular member.

117.    While working for the DEVxDAO, Carbone would review the reputation point score of the members and prepare a monthly compensation report that would indicate how much each member would be paid in CSPR tokens. Relatedly, Carbone would generate invoices for each member, with their appropriate wallet address, physical address, name, and then submit to the ETA to confirm the monthly CSPR payment.

118.    In addition, Carbone attended the ETA weekly meetings; responded to member inquiries; helped the ETA troubleshoot financial-related problems related to the DEVxDAO; and performed other functions.

119.    Before his removal from ETA/DEVxDAO, Carbone had accumulated 373 reputation points from his involvement with the DAO.

### ii.    OSSA/CRDAO

120.    Carbone began at the OSSA/CRDAO as one of the five founding members. As a result of being one of the founding members, Carbone received 500 reputation points (the same amount every other founder received) pertaining to the OSSA/CRDAO.

121.    During his time at the CRDAO, Carbone helped create and manage the financials; helped create the website; went over the schematics on how the CRDAO would be developed and grown for future members; attended meetings; and completed other functions..

122.    Kaal recognized Carbone's work towards the OSSA/CRDAO, wherein he acknowledged that "Robert and I have to do a significant amount of extra work for OSSA in

comparison with the other founders (I would estimate it is about 4 to 6 times what the other founders do on a weekly basis measured on hour of input) but cannot keep lockstep in reputation because we both will rarely if ever provide code reviews."

123.    At one point, the attorney acting on behalf of the OSSA/CRDAO suggested that Carbone execute an employment contract between Kaal and Carbone and the OSSA/CRDAO given the volume of work Carbone was working on.

124.    Originally, Carbone was supposed to have been the accountant/Chief Financial Officer of the OSSA/CRDAO. However, he was not placed in such a position because the board members, which included Kaal and Steuer, decided not to.

125.    In exchange for not assuming the role of accountant/Chief Financial Officer and stepping down as a founder, the OSSA/CRDAO board (via email communication from Kaal) acknowledged that Carbone would: (1) retain his reputation points in the CRDAO and stay on as a member with full ability to policy and earn more reputation; and (2) any deferred compensation that Carbone received would be honored and he would have the choice of either getting paid out or eventually obtain an equivalent amount on CRDAO tokens if a CRDAO token sale were to happen.

126.    After his removal as a founder, Carbone accumulated additional reputation points for his work in reviewing and policing other DAO member's work products.

127.    Before his removal from the OSSA/CRDAO, Carbone had accumulated a total of over 800 reputation points.

### b. Grants Obtained by Carbone

128. During his time working for the ETA/DEVxDAO, Carbone worked on various grant proposals that were successful and obtained monetary compensation via CSPR tokens (or euros) upon their completion.

129. Before his ouster from the ETA/DEVxDAO, Carbone had been working on several grant proposals that were either completed, or partially completed, and were not compensated. Carbone estimates that the uncompensated work performed on these grants was well over €40,000.00.

### B. Mr. Carbone's protests of Wulf Kaal's self-dealing.

130. Carbone served as the accountant for the ETA/DEVxDAO and worked closely with Kaal. Relevantly, Carbone had first-hand knowledge the types of business dealings that the Kaal engaged in, including ascertaining whether or not his conduct was consistent with the purposes of The DAOs.

131. Carbone voiced concerns and critiques of Kaal and his dealings with the DAOs. Carbone argued for the need to reform certain protocols because Kaal acted against the principles of the DAOs. Notably, and upon information and belief, Kaal was actively using the DAO as if he exercised effective control; not only was this conduct morally concerning, but it also put into question the validity of the DAOs as properly run "Swiss Vereins" since Swiss law clearly dictates the way a Verein is supposed to be managed.

132. In particular, and as reflected above, Casper became the predominant funder of the grants and, consequently, the money-making scheme for the ETA/DEVxDAO. Consequently, Kaal began to direct the ETA/DEVxDAO away from its decentralized system to a far more centralized system that focused on the CSPR token.

133.    For example, in early 2022, Baumann and Kaal developed a "side-letter method" that directly benefitted the Casper association by crediting future grant money for the benefit of Casper and not the ETA/DEVxDAO and the CRDAO. Carbone protested the actions carried out by Kaal, noting that some members, including Kaal and Tony Greenberg ("Greenberg") (a regular member of the ETA/DEVxDAO who was also Kaal's business partner in a company called Menagerie), managed to allocate approximately €4,000,000.00 to the X-Prize Foundation to Casper's benefit. Indeed, during this period, the internal culture at the ETA/DEVxDAO broke down since money was being funneled on the basis of how grants would help develop the Casper ecosystem (for example, by raising the Casper's token value or helped generate traffic on the Casper blockchain) instead of the decentralized purpose.

134.    As another example, during the World Economic Forum held at Davos (2022), Kaal and Greenberg advertised their business entities, Menagerie and RampRate, which were entities intricately associated with the Casper brand and blockchain; this action was contrary to ETA policy, which stated that "travel policy is to be reimbursed when travel is for the DXD exclusively." Other members of the ETA/DEVxDAO also indicated that Casper was controlling the DEVxDAO by having the DEVxDAO pay for Kaal and Greenberg's travel to Davos.

135.    Carbone directly, and discretely, confronted Kaal about how his actions were directly contrary to Kaal's statements in the DEVxDAO white papers and jeopardized the legal status of The DAOs as properly constituted and managed Swiss Vereins. Specifically, and unlike what the DEVxDAO white papers stated, Kaal intentionally centralized power in The DAOs for himself in order to exert undue influence. **Moreover, Carbone indicated that by abusing the "not-for-profit" status of the ETA/DEVxDAO to obtain grant funds and then siphon them to the "for-profit" entities, such as the CRDAO, Kaal was further jeopardizing The DAOs**

**and their members**. What ensued after Carbone's protests was nothing short of a bad-faith, retaliatory campaign by the Individual Defendants to pretextually terminate Carbone from The DAOs.

136.     For example, Kaal appears to have intentionally delayed Carbone's project to integrate the DEVxDAO internal/offchain microservices (6 of them); first, by stating that Carbone needed to enter a Request For Proposal ("RFP") in the system and, subsequently, by controlling the point-of-contact, who was Kaal's business partner and a current employee of his.

137.     Even though Carbone won the RFP bid, he was never awarded the contract because Kaal delayed its progress and excluded Carbone from relevant meetings and information flows.

138.     As another example, Carbone questioned a proposal concerning the attendance of Kaal and Greenberg at the World Economic Forum in Davos, Switzerland, because of its high-cost travel and representation concerns, wherein Kaal and Greenberg were acting on behalf of Casper and not the ETA. Carbone advocated for halting the vote until additional discussions were held. Carbone advocated for other suitable representatives to travel to Davos and represent the DAOs; these suggestions were countered by Kaal.

139.     However, in addition to attacking the grants that Carbone was working on, the Individual Defendants appear to have conspired to develop a false pretext that would compel the members of the ETA/DEVxDAO to vote Carbone out.

## III.     THE DEFAMATORY STATEMENTS

140.     On or around October 13, 2022, Baumann contacted Carbone and claims there are serious allegations against him that allegedly involved Ms. Howe.

141.     Ms. Howe was the Compliance Director of the ETA and a former student of Kaal.

142.    On October 16, 2022, Carbone received a phone call from Tony Greenberg who accused Carbone of some unspecific misconduct; Carbone did not have any idea what Greenberg was talking about and believed that Greenberg was trying to extort Carbone into confessing something about Ms. Howe.

143.    On October 17, 2022, during the DEVxDAO's Monday meeting, Kaal led the agenda, discussing discipline procedures against associates. Specifically, Kaal referenced a DAO summit held in Puerto Rico on July 22, 2022, in which an individual allegedly lodged a serious accusation of sexual assault against a member of the DEVxDAO. Kaal indicated that three (3) legal teams were investigating the incident and indicated that the DAO had to remove the associate because of the violation of the Code of Conduct.

144.    The individual that Kaal was referring to was Carbone.

145.    Upon information and belief, the Code of Conduct that Kaal referenced was the draft version (i.e., unapproved and non-binding) Code of Conduct available on the ETA's website.

146.    Carbone was never investigated by any of the supposed three (3) legal teams that allegedly investigated the purported incident involving Ms. Howe and that Kaal indicated had investigated the serious accusations of sexual assault.

147.    To Carbone's surprise, during the October 17, 2023 meeting, Kaal and Greenberg went forward with the vote to begin the process of removing Mr. Carbone from the DEVxDAO.

148.    Prior to October 17, 2022, Ms. Howe never confronted Carbone about his conduct at any point. Over a multi-month period of time, Carbone messaged Ms. Howe and spoke over the phone with her without any issue.

149.    From July 22, 2022, Ms. Howe had never reproached Carbone about any supposed misconduct.

150. Carbone denied any wrongdoing. and was extremely surprised to learn that Ms. Howe supposedly made these accusations against him, especially since months had passed since the Puerto Rico summit and he had communicated with Ms. Howe via text messages and phone calls with no complaint from Ms. Howe.

151. As Carbone has come to learn, Ms. Howe **did not** lodge these accusations against him, as evidenced by message exchanges from Baumann. Specifically, the messages concerning the "findings" of the purported "investigator" (i.e., Baumann) who indicated that he "spoke with two VAs about this [incident]" and "[b]oth of them told me that they have not directly witnessed the alleged breaches." Crucially, Baumann relayed: "I spoke with the person who suffered the alleged breach [(i.e., Hayley Howe)]. The message from this person was clear – **No actions should be taken and this person will not act as a witness**." Baumann added that "I went a step further and I approached the alleged offending VA [(i.e., Carbone]). The breach was not confessed. This VA was rather confused about the situation/allegations."

152. Baumann, as an investigator for the ETA, had an inherent conflict of interest against Carbone.

153. **The fact that Ms. Howe informed the investigator that no actions should be taken and that she would not act as a witness means that the Board and the ETA had absolutely no evidence to support the conclusion that Carbone engaged in misconduct. Indeed, as admitted by Baumann, Carbone denied the allegations and appeared confused by the same, which bolsters Carbone's credibility that he did not engage in any wrongdoing**. Thus, there was absolutely no objective evidence that could implicate Carbone and constitute a finding against him that he violated any Code of Conduct or ETA/DEVxDAO policy.

154.    Upon obtaining the positions of Ms. Howe and Carbone, any actions concerning the matter should have ceased given the complete absence of evidence against Carbone. Nevertheless, Baumann and Kaal went ahead to maliciously publish the false accusations against Carbone to the members of the DEVxDAO.

155.    Kaal, Bauman, and Steuer, purporting to act on behalf of the DAOs and the ETA, *__falsely__* implied to the VA members that a robust investigation by three (3) legal teams was performed; this was a gross misrepresentation and, upon information and belief, was strongly relied upon by DEVxDAO members to justify Carbone's expulsion. Moreover, despite the claimed involvement of three (3) legal teams, Carbone was never contacted nor asked to provide documents in support of his defense. Consequently, the ETA and the board members of the DEVxDAO provided a forum for the baseless accusations to be communicated to the DAOs members.

156.    But for their actions, Carbone would not have been expelled from the DAOs; lost his accumulated reputation points; suffered reputational and emotional damages; and would not have lost grants that he had completed.

157.    Carbone's expulsion was not supported by any evidence since the alleged victim expressly indicated that she would not act as a witness. Nevertheless, it appears that Kaal (and others) forwarded the purported "investigation" that was nothing but a sham to the VA members and represented that a thorough investigation was performed and wrongdoing was found.

158.    Carbone has reason to believe that Ms. Howe was unduly pressured into making some type of unknown statement by Kaal (and potentially others) in order to justify Carbone's expulsion from the DEVxDAO.

159.    Between October 18 and 23, 2022, multiple meetings and messages were exchanged between the members of The DAOs and ETA concerning Carbone's purported

misconduct, including individuals raising serious concerns on the lack of information made available to the members.

160. Upon information and belief, Baumann and other individuals represented and made it appear as if a thorough investigation involving three (3) law firms had been conducted and that the allegations against Carbone were being publicized to members as a result of said investigation.

161. Upon information and belief, many members viewed the supposed thorough investigation by the three (3) law firms as very influential in their decision of whether to expulse Carbone from the DEVxDAO.

162. On October 22, 2022, an informal, non-binding vote was initiated at the behest of Kaal to ascertain member interest in ousting the alleged "anonymous" perpetrator (i.e., Carbone) relating to Baumann's supposed investigation. The result of the non-binding vote was to move forward with the formal, binding vote.

163. On October 24, 2022, a meeting of the DEVxDAO was held (the "October 24th Meeting) in which several board members and attorneys from the ETA (Baumann and Marco Aniballi ("Aniballi")) participated. Carbone and others were present at the meeting. During the October 24th Meeting, Baumann and Aniballi confirmed to all listeners that Kaal was the person who first brought up the alleged incident between Ms. Howe and Carbone.

164. On October 24, 2022, Carbone publicly voiced his concerns over the attempts to oust him because the attempt to maintain his perpetrator status as anonymous was a sham. **In particular, there was no other individual who was subject to be eliminated from the ETA/DEVxDAO, which means that – once the vote went through – every member of the ETA/DEVxDAO would absolutely know who the alleged perpetrator was**. Accordingly, any claims by the Defendants that Carbone's identity would remain anonymous was nothing short of

a provable disingenuous falsehood. Carbone was under duress to defend himself in a very short amount of time, and with no information at this disposal.

165.    Carbone further voiced his concerns over the failure of the ETA/DEVxDAO to follow applicable due process rights, which Swiss law certainly recognized.

166.    During the October 24th Meeting, a vote was proposed at the behest of Kaal concerning the allegations against Carbone, which were now public and known to the ETA/DEVxDAO members. In particular, the basis cited to remove Carbone was that he allegedly violated the Code of Conduct. The result of the vote was to remove Carbone from the ETA/DEVxDAO and slash his reputation points to 0.

167.    A review of the voting results, however, were notable because – out of the 18 people who voted – around 98.2% of the reputation points that were staked came from four individuals: Kaal (170 reputation points), Greenberg (90 reputation points), Steuer (150 reputation points) and Alex Kelly (Steuer's co-owner in Make Software, which is the top developer on the Casper blockchain and manages Casper's TestNet) (133 reputation points). Indeed, it is notable that **13 individuals** staked between 1 reputation point *or less* and 1 individual staked 3 points. As underscored above, the voting pattern concerning Carbone's ouster reflects an inherent disagreement (confirmed by the liveliness of the discussions held during the October 24th Meeting) of most of the ETA/DEVxDAO members of the basis for Carbone's ouster; this disagreement, however, appears to not have been communicable given the culture of fear that permeated the DEVxDAO because of the Individual Defendants' dealings.

168.    Steuer, as the DAM of the ETA/DEVxDAO, moved forward with the unsubstantiated and baseless finding against Carbone and presented the same to the Board to effectuate Carbone's removal from the ETA/DEVxDAO.

169.     Carbone was purportedly removed from the ETA/DEVxDAO via a formal letter that appears to have been mailed on October 25, 2022.

170.     As a result of being expelled from the DEVxDAO, Carbone lost 373 reputation points that were valued at approximately €1,000.00 in monthly income.

171.     As a result of his ouster from the ETA/DEVxDAO, Carbone was also unable to submit milestone proposals related to completed grant work, resulting in the non-payment of over €40,000.00.

172.     On October 30, 2022, Carbone received an e-mail from Michael Mosimann ("Mossiman"), an attorney who stated that he was acting on behalf of the CRDAO, that the board was "unhappy" with Carbone's performance and that it also had "ethical concerns" concerning the expulsion vote relating to the DEVxDAO. Mossiman indicated that "the board would like to grant you the chance to withdraw from CRDAO and from any code reviews yourself. The board expects you to do so by noon EST on Monday, October 31, 2022. By no later than the same deadline, the board expects you to waive any and all claims to CRDAO tokens or other tokens by e-mail to OSSA's board. Please copy me into this communication." Mossiman threatened that the CRDAO board would go ahead with a proposal to the CRDAO voting associates to expulse Carbone from the CRDAO and eliminate all of Carbone's reputation points that had vested.

173.     On November 2, 2023, Steuer, acting upon the information he received during the voting procedure with the ETA/DEVxDAO concerning Carbone's ouster, explicitly demanded that Carbone be removed from the OSSA/CRDAO.

174.     The members of the OSSA/CRDAO, which were only Kaal, Steuer, Carbone, Mohammet Kara, and David Tai, voted to remove Carbone from the OSSA/CRDAO.

175.     Carbone never received a letter noting his removal from the OSSA/CRDAO.

176.     As a result of his expulsion from the CRDAO, Carbone lost his reputation points, which totaled 800 reputation points and was worth approximately €3,400.00 a month in value.

177.     After his expulsion from The DAOs, Carbone learned that Baumann helped found the Byzantine Association *before* Carbone's investigation and termination from The DAOs. Carbone also learned that Kaal represented that he was a co-founder of the Byzantine Association on his LinkedIn page. Thus, the fact that Baumann appears to have been working alongside Kaal to financially benefit from the Byzantine Association raises serious concerns as to whether Baumann had a material conflict of interest when he acted as the investigator over Carbone's matter.

178.     In addition, Carbone has reason to believe that in December 2022, Kaal loaded the boards of The DAOs with associates that would respond to him by promising extra reputational points in order to exert undue influence over them.

179.     Once Kaal achieved his goals concerning the ETA/DEVxDAO, and after 6 months of stagnation, Kaal exerted his influence and control to dissolve the ETA/DEVxDAO and, then reclassify this Swiss association as a litigation fund to cover the Individual Defendants and the "John" and "Jane" Doe defendants ##1-35 from their personal liability.

180.     Carbone never received a copy of the dissolution documents.

181.     The Dissolution Proposal affects parties such as Carbone who worked for the DAOs and was wrongfully expelled without receiving reasonable compensation, including compensation that had vested before Carbone's removal.

182.     Notably, if the ETA/DEVxDAO were to be reclassified as a partnership (as opposed to a Swiss association), a whole slew of questions would arise as to the rights and privileges that

Carbone would be entitled to, including the legal causes of action against the Individual Defendants and "John" and "Jane" Doe defendants ##1-35.

## IV.     DAMAGES SUFFERED BY THE PLAINTIFF

183.     Carbone suffered significant damages because of the Defendants' actions, which were malicious, willful, wanton, and evidence of a conscious disregard for Carbone's rights and wellbeing.

184.     As a direct and proximate cause of the defamatory statements forwarded by the Individual Defendants, Carbone suffered damages, including, *inter alia*, injury to his reputation, harm to his ability to carry out his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

185.     As a direct and proximate cause of the Defendants' actions, including their tortious interference with Carbone's contracts and business dealings with The DAOs, Carbone lost present and future business opportunities in an amount to be determined at trial. For example, Carbone lost the monthly income that he was deriving from the reputation points he vested while working for the ETA/DEVxDAO and the CRDAO.

186.     As a result of the Defendants' actions, Carbone also suffered damages tied to the loss of his reputation tokens as contemplated within the structures of The DAOs and the grants that went unpaid. Carbone estimates these damages at no less than $140,000.00.

187.     As a result of the Defendants' actions, Carbone can evidence that he lost multiple business opportunities within The DAOs ecosystem estimated at no less than $300,000.00.

188.     Because of the Defendants' bad faith conduct to unjustifiably remove Carbone from The DAOs, Carbone also demands reasonable attorneys' fees, costs, and expenses to pursue this action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### DEFAMATION

189.    Plaintiff realleges and incorporates by reference the preceding allegations as if set forth in full.

190.    The Individual Defendants forwarded false statements and allegations against Mr. Carbone in which they implied that Mr. Carbone engaged in serious sexual misconduct against Ms. Howe.

191.    Despite the fact that Mr. Baumann explicitly recognized that he "spoke with the person who suffered the alleged breach [(i.e., Hayley Howe)]" and Ms. Howe indicated that "[n]o actions should be taken and that [she] will not act as a witness," Mr. Kaal and Mr. Baumann nevertheless went ahead and moved forward with publishing false accusations that targeted Mr. Carbone.

192.    The statements forwarded by Mr. Baumann and Mr. Kaal were made without privilege to a third-party and were made with malicious intent or negligently.

193.    The publication of the statements on the message board of the DEVxDAO and to its members caused significant reputational harm, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### TORTIOUS INTERFERENCE OF CONTRACT/BUSINESS RELATION

194.    Plaintiff realleges and incorporates by reference the preceding allegations as if set forth in full.

195.    Carbone established a valid contract and/or business relationship with The DAOs, their boards, and its individual members, that created rights over reputation points, grants, and other business dealings.

196.    The Defendants knew that Carbone had such established contracts and/or business relationships with The DAOs, their boards, and their individual members.

197.    The Defendants knew that by creating a false pretext to remove Carbone from the DAOs, Carbone would have lost his vested reputation points, additional reputation points, grants, and other business dealings.

198.    The Defendants had no justification for removing Carbone from The DAOs since they were fully aware that they lacked the evidence from Ms. Howe or Carbone to publicize baseless and false allegations to the members of The DAOs that Carbone had engaged in some purported sexual misconduct against Ms. Howe.

199.    Carbone suffered damages from the tortious interference caused by Defendants, specifically the loss of valuable reputation points; grant funds; business dealings; and future business arising from the aforementioned consideration, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**

200.    Plaintiff realleges and incorporates by reference the preceding allegations as if set forth in full.

201.    The Individual Defendants owed a fiduciary duty to Carbone in their capacity as members of The DAOs.

202.    By virtue of the above-described actions of the Individual Defendants, including their publication of known false allegations that Carbone engaged in serious sexual misconduct

against the Compliance Director of the ETA, Hayley Howe, the Individual Defendants breached their duty to Carbone.

203.    Such conduct is a breach of the Individual Defendants' duties to Carbone because, among other things, it was designed to benefit the Individual Defendants to the detriment of Carbone.

204.    Carbone suffered damages as a breach of the Individual Defendants' duties and is entitled to compensatory damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**

205.    Plaintiff realleges and incorporates by reference the preceding allegations as if set forth in full.

206.    Alternatively, Plaintiff contends that the Individual Defendants' conduct constituted, at a minimum, negligent misrepresentation.

207.    The Individual Defendants were negligent in publishing false allegations regarding Carbone's alleged conduct pertaining to Ms. Howe.

208.    Carbone suffered damages as a result of the Defendants' negligent misrepresentations and is entitled to compensatory damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor against Defendants, as follows:

1)    awarding Carbone compensatory damages of not less than $1,000,000.00, or in such additional amount to be proven at trial;

2)    awarding Carbone punitive damages in an amount to be proven at trial and to the maximum extent permitted in law;

3)      awarding Carbone no less than $140,000.00 from the damages stemming from the loss of his reputation tokens and unpaid grants;

4)      awarding Carbone no less than $300,000.00 in damages stemming from the demonstratable loss of business opportunities;

5)      awarding Carbone all of his expenses and cots, attorneys' fees, and related expenses; and

6)      granting such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff Robert Carbone respectfully demands a jury trial on all issues so triable.

*/s/ Spencer E. Krebs*
Chelsea Mikula
Spencer E. Krebs
TUCKER ELLIS LLP
950 Main Avenue - Suite 1100
Cleveland, OH  44113-7213
216.592.5000
chelsea.mikula@tuckerellis.com
spencer.krebs@tuckerellis.com

*/s/ Jorge M. Marquez*
Jorge M. Marquez (*Pro Hac Vice motion forthcoming*)
WARREN LAW GROUP
519 8th Ave, 25th Fl.
New York, New York 10018
787-525-8895
jmarquez@warren.law

Attorneys for Plaintiff Robert Carbone